ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JENNIFER M. RESNIK
Assistant United States Attorney
Asset Forfeiture Section
(Cal. State Bar # 233634)
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-6595
    Facsimile: (213) 894-7177
    E-mail: jennifer.resnik@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SACV13- 0786 JST (ANx) |
| Plaintiff, | VERIFIED COMPLAINT FOR FORFEITURE |
| v. | |
| $548,937.00 IN U.S. CURRENCY, | [18 U.S.C. § 981(a)(1)(A) and (C)] |
| Defendant. | [U.S.S.S.] |

The United States brings this claim against the defendant $548,937.00 in U.S. currency (the "defendant currency"), and alleges as follows:

//

//

## JURISDICTION AND VENUE

1.  This is a civil forfeiture action brought pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).

2.  This court has jurisdiction over the matter under 28 U.S.C. §§ 1345 and 1355.

3.  Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

## PERSONS AND ENTITIES

4.  The plaintiff is the United States of America.

5.  The defendant is $548,937.00 in U.S. currency seized on or about June 14, 2012, pursuant to a federal search warrant executed at the residence of Atiqullah Nabizada and Frishta Noory in Coto de Caza, California (the "Coto de Caza residence").

6.  The interests of Atiqullah Nabizada, Frishta Noory, Ismatullah Noory and Lina Noory may be adversely affected by these proceedings.

7.  The defendant currency is currently in the custody of the United States Secret Service, where it shall remain subject to this court's jurisdiction during the pendency of this action.

## EVIDENCE SUPPORTING FORFEITURE

8.  Beginning on a date unknown and continuing to at least February 2012, Atiqullah Nabizada ("Nabizada"), Kenneth Moore ("Moore"), Frishta Noory ("Frishta") and others, were involved in several distinct real estate fraud schemes, including a short sale approval letter fraud scheme, a transactional funding fraud scheme and a grant deed/title takeover scheme. These real estate fraud schemes involved at least 22 different properties

and victims, and resulted in millions of dollars of losses.  The real estate fraud schemes were generally perpetrated by Nabizada, Moore, Frishta and others using various shell companies operated and/or controlled by them, including, but not limited to Discounted Property Investments, LLC ("DPI"); Management Resource Group ("MRG"); Newport Assets, LLC; Nabinor, LLC ("Nabinor"); and Lexington Group.  Nabizada, Moore, Frishta and others would open and operate bank accounts in the names of these companies in order to facilitate the fraud schemes.

9.    The Bank of America ("BofA") account number ending in 1384, in the name of MRG (the "MRG account") was opened in or about May 2010.  The signatories on this account were Nabizada's wife, Frishta, and Waheed Noory, Frishta's brother.

10.    The BofA account number ending in 5597, in the name of DPI (the "DPI account") was opened on or about April 11, 2011 with a deposit of $100.00.  Moore was the sole signatory on the account and was purported to be the "Managing Member" of DPI. Security video obtained from Bank of America shows Nabizada accompanying Moore on multiple occasions to withdraw large amounts of cash from the DPI account.

11.    The BofA account number ending in 3350, in the name of Nabinor (the "Nabinor Account"), was opened on or about September 17, 2010.  The two authorized signatories on the Nabinor account were Frishta and Nabizada.

**Fictitious Short Sale Approval Letter Fraud Scheme**

12.    A short sale transaction is one in which a lender, holding a deed of trust on a property, agrees to accept a lesser amount than what is owed to it pursuant to the note in exchange

3

for releasing its secured interest in the property.  A short sale generally occurs when the value of a property has dropped below the principal amount owed on one or more of the mortgage notes on the property.

13.  In order for a legitimate short sale to take place, one or more of the lenders holding notes against a particular residential property must agree to allow the homeowner to sell that property for less than what is owed on the note(s).

14.  The lender, or lenders, must approve the amount agreed upon by the seller and the buyer.  Generally, lenders will provide a "short sale approval letter" to indicate their approval of a short sale price and their agreement to accept less money than they are owed.  In addition, the homeowner who is defaulting on the loan(s) must approve the sales price.  In most cases, the approval is conditioned on approval of the sales price by the lender.  Because the property is "under water," the homeowner receives no proceeds from a short sale.  The benefit of a short sale to the homeowner is that he avoids foreclosure and its negative effects on his credit, and is released from the obligation of repaying the full amount of the loan(s).  Thus, the homeowner in a short sale transaction will generally approve a sales price that he believes will be (or has been) approved by his lender(s).

15.  In the fictitious short sale approval letter fraud scheme perpetrated by Nabizada, Moore, Frishta and their co-conspirators, the conspirators would profit by creating and/or circulating fraudulent short sale approval letters for distressed properties purportedly prepared by BofA (which was

the lienholder on each of the subject properties) with approval amounts that were far below the fair market value of the property.  Some of these fraudulent short sale approval letters were obtained from an insider at BofA who prepared and provided unauthorized letters in exchange for monetary bribes from the conspirators.  The fraudulent short sale letters would be sent to the title insurance company, which would insure title on the subject property believing that BofA had approved the short sale and that the liens against the subject property would be lifted providing the buyer with clear title.

16.  In one variation of the scheme Nabizada, Moore and their co-conspirators would purchase a distressed property using a shell company operated and/or controlled by Nabizada, Moore and Frishta.  The property would be purchased for the below-market price listed in the fraudulent short sale approval letter (the "A-B transaction").  Nabizada, Moore and their co-conspirators would then "flip" the property by selling it to a bona fide buyer for an amount that was still below the fair market value, but substantially above the fraudulent short sale amount (the "B-C transaction").  The A-B and B-C transactions would often occur within days of each other, frustrating the ability of unsuspecting parties to detect the fraud.  The difference between the A-B transaction price and the B-C transaction price was often in the hundreds of thousands of dollars, resulting in substantial profits for the conspirators.

17.  Nabizada, Moore and their co-conspirators would often use Point Break Escrow ("PBE") and, more specifically co-conspirator Jackie Burchell ("Burchell"), a PBE escrow agent, to

facilitate their fraudulent real estate transactions.  Burchell helped to conceal the discrepancy between the fraudulent approval price and the price paid by the end-buyer (party "C") by producing and circulating fraudulent HUD-1 Settlement Statements.

18.   In another variation of the fraudulent short sale scheme, Nabizada, Moore, Frishta and others would obtain refinance loans immediately upon the closing of the A-B sale of the subject property to them or one of their entities in order to draw the equity out of the property (again before the title company was able to discover the fraud).  Unsuspecting lenders would provide loans to Nabizada, Moore, Frishta and their co-conspirators and/or the entities they controlled, under the false belief that the subject properties used to secure the loans were owned free and clear of any BofA liens.

19.   As part of the scheme, Nabizada, Moore, Frishta and their co-conspirators would cause actual funds to be transferred to the title insurance company, generally Pacific Coast Title ("PCT"), in an amount substantially similar to (but usually slightly less than, on account of closing costs and fees) the amount stated in the short sale approval letter.  PCT would then disburse those funds to BofA in an attempt to secure the reconveyance of all liens against the property.  In most of the transactions involving fraudulent short sale letters, BofA rejected the wires from PCT because the funds did not match any legitimate short sale transaction authorized by BofA.  BofA would then wire the funds back to the title insurance company rather than reconvey the liens held against the subject

property.  Thus, the owners of the properties were left holding properties with substantial and unanticipated liens and/or subsequent lenders were left holding deeds of trust that were second in priority to those held by BofA.

20.  Nabizada and Moore would often use aliases while conducting their real estate fraud schemes in order to conceal their involvement in these transactions.  Nabizada was often known as "Gio Khair," "Avon Tess," "Kevin Smith," and/or "Ralph Aduchi."  Moore was often known as "David Brown," and/or "Lloyd Holbrook."

Examples of Fictitious Short Sale Approval Letter Fraud

**The Palm Desert Property**

21.  In or about March 2011, G.S. and R.S. went to see a property in Palm Desert, California[1] (the "Palm Desert property") because they were interested in purchasing the property.  G.S. and R.S. were told that BofA had pre-approved a short sale price on the Palm Desert property of $599,000, even though BofA maintained over $800,000 in liens against the home.  G.S. and R.S., believing that they were purchasing the Palm Desert property directly from the prior owners, G.H. and B.H, made an offer to purchase the property for $599,000.00.  However, as explained below, G.S. and R.S. unknowingly purchased the Palm Desert property from DPI.

22.  On or about April 13, 2011, $156,000.00 was sent to PBE's trust account from the Nabinor account and credited to PBE's escrow file number 12929-JB.  This $156,000 was used to

---

[1] In compliance with Rule 5.2-1 of the Local Civil Rules for the Central District of California, only the city and state for home addresses are listed.

7

1 purchase the Palm Desert property in the A-B transaction. On or
2 about April 14, 2011, a wire transfer in the amount of
3 $144,542.82 was sent from PBE's trust account (specifically,
4 from escrow file number 12929-JB) to PCT's bank account held at
5 East West Bank.

6     23. The "Final" HUD-1 Settlement Statement for PBE escrow
7 file number 12929-JB dated April 15, 2011, showed that the Palm
8 Desert property was sold by G.H. and B.H. to DPI for
9 $150,000.00.

10     24. G.S. and R.S. were told that they had to use PBE for
11 the real estate transaction, and the transaction closed on or
12 about April 15, 2011, after G.S. and R.S. wired $598,202.09 from
13 their personal bank account to PBE's bank account at Citizen's
14 Business Bank (the "PBE account") for the purchase of the Palm
15 Desert property. The wire from G.S. and R.S. referenced PBE
16 escrow file number 12941-JB (the B-C transaction for the Palm
17 Desert Property).

18     25. BofA continues to hold one lien against the Palm
19 Desert property in the amount of $806,000.00 - - loan number
20 872604508. On or about April 15, 2011, PCT sent a wire transfer
21 in the amount of $131,666.18 to BofA's mortgage clearing account
22 ("BofA's MRC account") referencing the Palm Desert property
23 lien. This money constituted a purported payoff to BofA, as a
24 short sale payment on the BofA mortgage/lien held against the
25 Palm Desert property. Had this been a legitimate short sale
26 transaction, where in fact this amount was an approved payoff of
27 the associated BofA lien, this payment would have caused BofA to
28 reconvey its lien held against the Palm Desert property.

However, the BofA short sale approval letter used to facilitate the Palm Desert property transaction was fraudulent and not, in fact, issued by BofA.  Accordingly, on or about May 10, 2011, BofA rejected the wire from PCT, and $131,666.18 was returned to PCT's East West Bank account.  BofA did not reconvey its lien against the Palm Desert property.

26.   Subsequent to the closing of the B-C transaction on the Palm Desert property, on or about April 19, 2011, a wire in the amount of $552,301.61 was sent from PBE's account to the DPI account referencing PBE escrow file number 12941-JB.  The $552,301.61 minus the $156,000.00 that was wired for the initial purchase of the Palm Desert property in the A-B transaction (i.e, $396,301.61) represents the net fraud proceeds received by DPI on the Palm Desert property.

**The Coto de Caza Property**

27.   On or about January 18, 2011, MRG instructed PBE to issue a check in the amount of $445,000.00 drawn off PBE's own trust account for escrow file number 12603-JB (related to the purchase of a property from MRG located in Agoura Hills, California - the check representing proceeds to MRG of that transaction), and made payable to PBE escrow file number 12553-JB, in order to purchase the Coto de Caza property.

28.   BofA holds one lien against the Coto De Caza property in the amount of $1,833,750.00 - - loan number 126263164.

29.   On or about January 18, 2011, PBE sent a wire transfer, in the amount of $394,896.28 from the PBE account, to PCT's Wells Fargo bank account referencing escrow file number 12553-JB.  On January 18, 2011, PCT sent a wire from the Wells

Fargo account in the amount of $307,030.46 to BofA's MRC account
referencing BofA's lien against the Coto de Caza property.   This
$307,030.46 constituted a purported payoff to BofA, as a short
sale payment on the BofA mortgage/lien held against the Coto de
Caza property.   Had this been a legitimate short sale
transaction, where in fact this amount was an approved payoff of
the associated BofA lien, this payment would have caused BofA to
reconvey its lien against the Coto de Caza property.   However,
the BofA short sale approval letter used to facilitate the Coto
de Caza property transaction was fraudulent.   Accordingly, on or
about February 4, 2011, BofA rejected the wire from PCT for the
Coto de Caza property and a wire in the amount of $307,030.46
was returned to PCT's Wells Fargo account.

    30.   At or about the time of the closing of the Coto de
Caza property, Frishta, acting in the name of MRG, obtained a
loan against the Coto de Caza property in the amount of
$840,000.00 from B.B., a hard-money lender.   That loan
transaction was assigned escrow number 12554-JB by PBE.   B.B.
made the loan to MRG without the knowledge that BofA would
continue to hold a large lien against the Coto de Caza property.
Pursuant to the B.B. loan, $804,300.00 was wire transferred from
B.B. to PCT's Wells Fargo bank account on January 21, 2011,
referencing PBE escrow number 12554-JB.   On January 25, 2011,
PCT sent a wire in the amount of $803,004.00 from its Wells
Fargo bank account to the PBE account, referencing PBE escrow
number 12554-JB.   On the same day, PBE sent a wire in the amount
of $756,006.67 from the PBE account to the MRG account, which

represents the fraud proceeds to MRG and Frishta for the
transactions relating to the Coto de Caza property.

**Transactional Funding Fraud Scheme**

31.   In the transactional funding fraud scheme Nabizada,
Frishta and others would identify a piece of property and then
cause paperwork to be drawn up for two transactions – again, A-B
and B-C transactions – and then execute these transactions.
Nabizada, Frishta and others would generally act as the "B"
buyer in the "A-B" transaction, sometimes using straw purchasers
to distance themselves from the transaction.   Sometimes
Nabizada, Frishta and others would also surreptitiously cause
another buyer to be injected into the middle of the A-B
transaction without the knowledge of Party A or the
transactional lender.   Under this scheme, Nabizada, Frishta and
others did not intend to close the "B-C" leg of the
transactions.   The documents relating to the "B-C" transactions
were often entirely fabricated.

32.   Before the "A-B" transaction closed, Nabizada, Frishta
and others (acting as Party B) would obtain a loan from a
transactional lender to be used to pay off the liens on the
subject property, with the transactional lender assuming that
the "B-C" transaction would close and allow the lender to be re-
paid.   The conspirators took advantage of the fact that, due to
the short-term nature of these loans, it is not uncommon for
transactional lenders to execute, but not record, certain
documents used to protect their interest in the subject
property.   Instead, these documents (such as a deed of trust)
are often held with the escrow company.   Assuming there is not a

default and the transactional lender is re-paid from the proceeds of the "B-C" transaction, the documents are never recorded.

33.   Once the loan from the transactional lender funded the "A-B" transaction, it temporarily appeared that buyer "B" (Nabizada, Frishta and their co-conspirators) now owned the property free and clear because the transactional lender, per their usual practice, did not record certain documents in the interim.

34.   Nabizada and his co-conspirators attempted to obtain fraud proceeds as a result of these transactions by two separate means, depending on how the transactions were set up.   In one scenario, Nabizada, Moore and others would create a fictitious escrow company to act as the settlement agent for the A-B and, in most cases, the B-C transactions.   The conspirators would identify a bank account that they controlled, and instruct the transactional lender to wire the loan funds for the A-B transaction to that account.   Because the B-C transaction was often a completely fabricated contract, and the conspirators did not really intend to close this transaction, the conspirators would be able to withdraw the funds and retain the loan proceeds once the loan funds were wired by the transactional lender.

35.   In the second scenario, Nabizada, Frishta and others would use a legitimate escrow company that was generally a co-conspirator in the scheme.   Before the A-B transaction would close, the conspirators would inject a middle buyer who would pay less for the property than the amount funded by the transactional lender.   Subsequently, the property would be

1  transferred to Party B and close once the transactional lender
2  had executed the loan.   In these instances, the conspirators
3  would profit from the difference between the amount paid for by
4  the middle buyer and the amount funded by the transactional
5  lender.   Given that the B-C transaction was completely
6  fabricated, the transactional lenders were forced to attempt to
7  foreclose or take back the property through other means, which
8  was difficult and time-consuming.   The transactional lenders
9  would often resort to filing lawsuits against the parties
10 involved in the fraud.   However, the conspirators often used
11 fictitious names and/or shell entities and they were often
12 difficult to identify for purposes of a civil suit.   Even when
13 they were identified, they viewed default and/or settlement of
14 the claims as a cost of doing business for their fraudulent
15 scheme.

16          Examples of Transactional Lender Fraud
17 **The Ambergate Property**

18          36.   In or about September 2011, Nabizada, using the name
19 and identity of J.M., a real estate agent who worked for
20 Pinnacle Estate Properties in the Los Angeles area, contacted
21 Tempo Funding, a New York City based transactional lending firm.
22 Nabizada represented that he was seeking transactional funding
23 to purchase a bank-owned property located on Ambergate Drive in
24 Rancho Palos Verdes, California (the "Ambergate Property") for
25 $750,000 (the "A-B Transaction").   Nabizada also represented
26 that he and others would immediately re-sell the Ambergate
27 Property to a third party for $905,000 in cash (the "B-C
28 Transaction").   He further represented that he already had

13

funding in place that would be used to repay the loan from Tempo
Funding.   Nabizada requested a loan in the amount of $677,665 on
behalf of his purported client, Phh Alternative CA-18, LLC (the
B buyer/seller).

37.   In fact, neither the A-B nor B-C transaction for the
Ambergate property was real.   The owner of the Ambergate
Property was not aware of Nabizada or either of the purported
transactions, and there was no C buyer with cash in place.   Phh
Alternative CA-18, LLC was a corporation established by
Nabizada, Moore and their co-conspirators using false names and
identities for the sole purpose of facilitating this and other
fraudulent schemes.   The conspirators intended to use the
proceeds of the loan from Tempo Funding for other purposes, and
had no intention of ever repaying the loan.

38.   In an effort to facilitate the scheme and secure the
loan for the purchase of the Ambergate property, Nabizada and
others provided documents to an undercover law enforcement agent
("UC") posing as a Tempo Funding employee tasked with handling
the transaction.   Nabizada sent documents purporting to show
that the A-B and B-C Transaction contracts were in place and
ready to close, including purchase agreements/contracts; a list
of comparable properties (intended to establish value); an
escrow deposit receipt purporting to show that $75,000 had been
deposited in the escrow account as a deposit on the A-B
Transaction; a certificate of liability insurance; a preliminary
title report; and escrow deposit receipts showing that the
$905,000 in cash for the B-C Transaction had been deposited in
an escrow account.   On the purchase agreements was listed the

14

1  California Department of Real Estate license number of the real

2  J.M.   Nabizada also provided the UC with purported wire

3  instructions from escrow for the loan from Tempo Funding, by

4  which he intended to induce Tempo Funding to send a wire from

5  New York to California to fund the requested loan.   During

6  conversations with the UC, and at Nabizada's direction, a co-

7  conspirator pretended to be an escrow agent named Rick Wolpert,

8  who represented that he could verify the documents and confirm

9  the transaction.   Nabizada also established a bank account which

10  he falsely represented to be an escrow account belonging to the

11  escrow company (this was the account to which he instructed the

12  UC to wire the loan proceeds).

13      39.   Nabizada ultimately cancelled the transaction for the

14  Ambergate property when he discovered that law enforcement was

15  aware of his efforts to obtain the loan from Tempo Funding.   The

16  conduct set forth above related to the Ambergate property forms

17  the basis of the criminal charges against Nabizada and Moore in

18  United States v. Atiqullah Nabizada, CR. 12-534-CAS.

19  **Four San Bernardino Properties**

20      40.   In January 2010, Nabizada, Frishta and others, using a

21  company controlled by them, A&F Capital Investments, Inc.

22  ("A&F"), conspired to fraudulently acquire four properties in

23  San Bernardino, California (the "four San Bernardino

24  properties").   A&F secured funding for the purchase of these

25  properties from Aegis RE Partners, LLC ("Aegis"), a company

26  based in Florida that provides non-recourse equity capital to

27  investors seeking to acquire distressed properties.

28

41. Aegis provided acquisition financing to A&F based on representations by A&F and others that A&F was purchasing the four San Bernardino properties directly from the prior owner, Galt Corp., for $200,000.00 each (the A-B transaction). Aegis was also told that A&F was under contract with end buyers to sell the four San Bernardino properties for prices ranging from $285,000.00 to $315,000.00 each (the B-C transactions). In reality, A&F and other co-conspirators orchestrated a scheme by which another co-conspirator purchased the four San Bernardino properties from Galt Corp. without the knowledge of Aegis and then immediately flipped the properties to A&F for approximately $200,000.00 each.

42. To facilitate the scheme and to secure funding from Aegis, A&F (i) prepared and provided contracts purporting to be between A&F and Galt Corp., forging the signature of John Galt, the owner of Galt Corp., on all documents; (ii) created and executed fraudulent sales contracts between A&F, as seller in the B-C transactions, to non-existent buyers; (iii) fabricated fraudulent cashier checks (which were purportedly the buyers' deposits) and buyer loan approval letters from BofA and other lenders; and (iv) provided Aegis with fraudulent HUD-1 closing statements, prepared by Burchell (who was working at escrow company Escrow Quick at the time) that purported to show A&F as the buyer (party B) and Galt Corp. as the seller of the four San Bernardino properties (party A).

43. Relying upon these false representations and documents, on or about February 12, 2010, Aegis wire transferred a total of approximately $819,569.00 to Escrow Quick to fund

1    loans to A&F for the purchase of the four San Bernardino
2    properties.   The wire transfers were made pursuant to wire
3    instructions provided by Burchell and signed by Frishta.   On or
4    about the same date, MRG received four wires from Escrow Quick
5    totaling approximately $60,000.00, which represented Nabizada
6    and Frishta's shares of the proceeds from the transactions on
7    the four San Bernardino properties.

8    **Grant Deed/Title Takeover Fraud Scheme**

9        44.   Nabizada, Moore and their co-conspirators also
10   participated in a scheme by which they fraudulently sold and/or
11   obtained loans secured by properties owned by other individuals
12   and entities.   After identifying a property that was either free
13   of encumbrances or had a significant amount of equity, the
14   conspirators would either fraudulently convey the property to an
15   individual under their control by forging a grant deed, or take
16   control of the title to the property by stealing and assuming
17   the identity of the owner of record.   In either case, the true
18   owner of the property was unaware that title to the property was
19   being controlled or conveyed by the conspirators.   Once
20   apparently in control of the title to the property, the
21   conspirators would either sell the property to an unwitting bona
22   fide purchaser or refinance the property and draw out
23   significant amounts of equity by obtaining a new deed of trust.
24   Since these transactions were typically executed by the
25   conspirators while using aliases, they were generally able to
26   complete the transactions without the victims finding out their
27   true identities.   The true owner would be left with a property
28   that had apparently been sold without his knowledge or had been

used as security for a new lien.  The buyers or lenders would be
left having purchased or refinanced a property that the true
owner never intended to sell or refinance.

Example of Grant Deed/Title Takeover Fraud

**The Beverly Hills Property**

45.  In or about July 2010, Nabizada and others completed a
scheme using a piece of property in Beverly Hills, California
(the "Beverly Hills property") which had been the subject of
multiple grant deeds.  The Beverly Hills property, valued at
approximately $2.5 million, was previously owned free and clear
by individuals residing in Saudi Arabia.  Through a series
fraudulent transactions, Nabizada and others sold the Beverly
Hills property without the knowledge and/or consent of the true
owners.

46.  In the course of the scheme, the Beverly Hills
property was transferred multiple times.  To facilitate these
transactions, Nabizada provided falsely signed and notarized
documents, deeding the title to the Beverly Hills property to
individuals who were not the true owners.  Through these series
of transactions, Nabizada obtained approximately $1,371,413.02
in fraud proceeds which was deposited into an account at Union
Bank in the name of Hans Property Investments, LLC (the "Hans
account").  On or about August 2, 2010, $1,371,000.00 in cash
was withdrawn from the Hans account and delivered by armored
transportation to Moore who signed for the delivery of the cash.

**Proceeds and Cash Withdrawals**

47.  Between approximately May 2010 and November 2011, the
DPI and MRG accounts received deposits in excess of $1.2 million

1  and $2.3 million, respectively, from PBE in the form of credits,
2  predominantly in the form of incoming wire transfers, as the
3  proceeds from PBE real estate transactions.

4      48.   Between April 29, 2011, and October 31, 2011,
5  approximately $986,497.00 in cash was withdrawn from the DPI
6  account.

7      49.   The Nabinor account was, in effect, used as a "slush
8  fund" to facilitate fraudulent real estate transactions.
9  Approximately 90% of all credits to this account, which totaled
10 more than $1.8 million, can be traced to proceeds obtained from
11 the back-end, or B-C, closings of a series of real estate
12 transactions.   Approximately 60%, or about $1.2 million, was
13 used to pay for the front end, or A-B, closings of numerous
14 property acquisitions.

15     50.   Between January 2011 and June 2011, approximately $1.5
16 million was transferred from the MRG account to the Nabinor
17 account.   Between April and December 2011, approximately
18 $40,036.00 in cash was withdrawn from the Nabinor account.

19     51.   Based on the above allegations, plaintiff alleges
20 that the defendant currency constitutes or is traceable to
21 proceeds of one or more violations of Title 18, United States
22 Code, Sections 1343 (Wire Fraud), 1344 (Bank Fraud), 1349
23 (Conspiracy to Commit Wire and Bank Fraud) and 1956 (Money
24 Laundering).   These violations constitute "specified unlawful
25 activity" as described in 18 U.S.C. § 981(a)(1)(C), authorizing
26 the forfeiture of proceeds of "specified unlawful activity" as
27 defined at 18 U.S.C. § 1956(c)(7).   The defendant currency is

28

1   therefore subject to forfeiture pursuant to 18 U.S.C. §

2   981(a)(1)(A) and (C).

3       WHEREFORE, the United States prays that:

4           a.   due process issue to enforce the forfeiture of

5   the defendant currency;

6           b.   due notice be given to all interested parties to

7   appear and show cause why forfeiture should not be decreed;

8           c.   this court decree forfeiture of the defendant

9   currency to the United States of America for disposition

10  according to law; and

11          d.   for such other and further relief as this court

12  may deem just and proper, together with the costs and

13  disbursements of this action.

14

15  DATED: May 17, 2013              Respectfully submitted,

16                                   ANDRÉ BIROTTE JR.
                                     United States Attorney
17                                   ROBERT E. DUGDALE
                                     Assistant United States Attorney
18                                   Chief, Criminal Division
                                     STEVEN R. WELK
19                                   Assistant United States Attorney
20                                   Chief, Asset Forfeiture Section

21

22                                   _____

23                                   JENNIFER M. RESNIK
                                     Assistant United States Attorney
24                                   Attorneys for Plaintiff
                                     United States of America

25

26

27

28

## VERIFICATION

I, TERENCE O'ROURKE, hereby declare that:

1.   I am a Special Agent with the United States Secret Service and I am the case agent for the forfeiture matter entitled <u>United States v. $548,937.00 in U.S. Currency</u>.

2.   I have read the above Verified Complaint for Forfeiture and know its contents.  It is based upon my own personal knowledge and reports provided to me by other law enforcement agents.

3.   Everything contained in the Complaint is true and correct, to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed May <u>17</u>, 2013 in Los Angeles, California.

Terence O'Rourke

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Josephine Tucker and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV13- 786 JST (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [✓] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
UNITED STATES OF AMERICA

**DEFENDANTS**
$548,937.00 IN U.S. CURRENCY

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

JENNIFER M. RESNIK, Assistant United States Attorney
312 North Spring Street, 14th Floor, Los Angeles, CA 90012
T: (213) 894-6595; F: (213) 894-7177; E-Mail: Jennifer.Resnik@usdoj.gov

**Attorneys (If Known)**

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify):
☐ 6 Multi-District Litigation
☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☒ No   ☐ **MONEY DEMANDED IN COMPLAINT: $_____**

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
18 U.S.C. § 981(a)(1)(A) and (C)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☒ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

SA CV13-0786

**FOR OFFICE USE ONLY:   Case Number:** _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No  ☒ Yes
If yes, list case number(s): CR 12-534-CAS

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☒ A. Arise from the same or closely related transactions, happenings, or events; or
          ☒ B. Call for determination of the same or substantially related or similar questions of law and fact; or
          ☒ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
          ☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☒  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
    **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _(signature)_      Date    May 17, 2013

    Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |